**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

DAN CALLAHAN,             )
                                    )
            Plaintiff,           )
                                    )
vs.                               )          **Case No. 13-CV-816-TCK-FHM**
                                    )
COMMUNICATION GRAPHICS,    )
                                    )
            Defendant.         )

## OPINION AND ORDER

Before the Court are Defendant's Motion for Summary Judgment (Doc. 57); Defendant's Motion to Strike (Doc. 70); and Plaintiff's Motion to Deem Admissions (Doc. 61).[1]

## I.   Procedural History and Evidentiary Motions

Plaintiff Dan Callahan appears pro se. In the Court's Opinion and Order dated December 12, 2014, the Court set forth a detailed examination of the allegations in Plaintiff's Amended Complaint and construed such allegations as asserting the following six claims: (1) ADA hostile work environment (based on disability of attention deficit disorder ("ADD")); (2) ADA wrongful termination/failure to accommodate (based on disability of neck injury); (3) ADA retaliation; (4) state-law worker's compensation retaliation; (5) Title VII sexually hostile work environment; and (6) Title VII retaliation. The Court denied Defendant's motion to dismiss, and Defendant moved for summary judgment on all claims.

As evidence in support of its motion, Defendant attached the affidavit of Defendant's Human Resources Manager, Lynn Peters ("Peters"), excerpts from Plaintiff's deposition testimony, and the affidavit of Defendant's Plant Manager, Mike Kinsch ("Kinsch"). In response, Plaintiff submitted

---

[1]  The referral of Plaintiff's Motion to Deem Admissions to Magistrate Judge McCarthy is hereby withdrawn.

a brief responding to Defendant's legal arguments and attaching exhibits. (Doc. 57.)  Plaintiff then filed a motion to amend the response brief, which asserted additional arguments and attached additional exhibits.  (Doc. 65.)  The Court granted the motion to amend and construed the motion to amend as the amended response brief.  Therefore, the Court refers to Plaintiff's July 2, 2015 filing (Doc. 65) as the Amended Response.

To his Amended Response, Plaintiff attached Exhibits 4-36.  Of these, Defendant moved to strike Exhibits 5, 7, 10-12, 14, 16, 17, 19, 22, 28-30 and 32.  (*See* Doc. 70.)  For reasons set forth in Defendant's motion to strike, the challenged exhibits listed are not admissible under the federal rules.  Many are undated, handwritten notes by Plaintiff that were not produced in discovery.  Others are stray pages of medical records that cannot be readily authenticated or identified.  Therefore, Defendant's motion to strike is granted.  In determining whether a question of fact exists, the Court has considered Defendant's evidence and Plaintiff's exhibits to which there is no evidentiary objection.[2]

Plaintiff moved the Court to deem certain of his discovery responses admitted based on their receipt five days after the thirty-day deadline.  Assuming Defendant's responses were indeed five days late, Defendants have adequately explained any tardiness and Plaintiff has failed to show any prejudice resulting therefrom.  Therefore, Plaintiff's motion to deem his discovery requests admitted is denied.

---

[2] Pro se parties must still comply with the rules of the court, including the requirement to provide admissible evidence in support of a response to a summary judgment motion.  *See Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir. 1988).

## II.     Factual Background

Construing all admissible evidence in a light most favorable to Plaintiff, the following events occurred while Plaintiff was employed by Defendant Communication Graphics, Inc. Plaintiff, a white male, began working for Defendant on January 15, 2007 as a slitter/rewinder. In July 2010, Plaintiff suffered an injury to his neck at work when the backrest of a chair gave way. He reported this injury to Defendant. However, according to Plaintiff, he did not file a workers' compensation claim regarding his neck injury because Kinsch and others threatened him with this job. Plaintiff did not see a doctor for this injury because "[his] doctor said they wouldn't treat [him] unless you go through Worker's Compensation and they deny it." (Mot. for Summ. J., Ex. B, at 119:18-19.)

During 2011, Plaintiff was treated by Dr. Bart Rider for anxiety and high blood pressure. Plaintiff developed these conditions, at least in part, because employees of Defendant called him crazy, old, psychotic, and senile. Plaintiff believes his ADD condition, which caused him to be "spacey," led to this name-calling and harassment. On June 20, 2011, Dr. Rider recommended that Plaintiff be allowed "to go in at 4:15, and possibly stay later if needed to make up the difference." (Pl.s' Am. Resp., Ex. 24.) Plaintiff testified in his deposition that this request was made so that Plaintiff could "avoid the day shift" because "that's where a big part of the harassment was coming from." (Mot. for Summ. J., Ex. B, at 112:8-19.) Plaintiff also contends that he was subjected to sexually harassing behavior, which is described in more detail below.

On or before February 14, 2012, Plaintiff reported to his supervisor Todd Canton ("Canton") that he strained his neck while "pulling roll of stock off pallet (on floor)." (Pl.'s Am. Resp., Ex. 36, OSHA Form 301.) Although Plaintiff initially did not want to do so, Plaintiff ultimately decided he wanted to see a doctor for this injury. On February 15, February 22, March 1, and March 13,

2012, a doctor at MedCenter South ("MedCenter") filled out a Work/Activity Status Report for Plaintiff based upon his neck injury. In each of the four reports, the doctors released Plaintiff to work with certain restrictions. The final report, dated March 13, 2012, places Defendant on the following restrictions: no lifting, carrying, pushing, or pulling ten pounds or more, no right-handed work, and no work with arms overhead. Plaintiff returned to work in the same position on the night shift with these restrictions. On April 11, 2012, Plaintiff called Aaron Colburn ("Colburn") at Chubb Insurance, Defendant's workers' compensation insurer, and told him that he was being forced to perform tasks that violated his work restrictions.

The next day, on April 12, 2012, Peters sent Plaintiff a letter offering him the position of first-shift packager, which is referred to in Plaintiff's deposition as "shrink wrapper." The letter states that such position "will comply with the light duty restrictions designated by your doctor." (*Id.*, Ex. 8.) Plaintiff's compensation of $10.98/hour remained the same, but "there will not be a .25 cent shift differential." (*Id.*) With respect to this purported accommodation, Plaintiff testified that it was more physically difficult than his previous position. "We'd stack everything up on these carts . . . . And I'm guessing they weighed over 100 pounds. And I had to push those back and forth to the spot I had to wrap them . . . [E]ven people didn't have a neck injury had a hard time pushing them." (Mot. for Summ. J., Ex. B, at 117:16-21.)

On April 17, 2012, Plaintiff filed a workers' compensation claim regarding the neck injury. On July 5, 2012, Plaintiff provided a deposition as part of his workers' compensation claim. This deposition is not part of the record in this case.

According to Peters, Defendant began experiencing a slow-down in its sales in the summer of 2012. Peters testified that, as a result of this economic downturn, Plaintiff and four other employees were laid off in July 2012:

> CHI was forced, due to an economic induced reduction in force, to terminate two (2) employees in the Production Department on July 12, 2012. Due to continued slowed sales, CGI was again forced to reduce the number of its employees. On July 24, 2012, CGI terminated an additional three (3) employees in the Production Department as part of an economic induced reduction in force. Callahan was one of these three Production Department employees that were laid off on July 24, 2012.

(Peters' Aff., Ex. A to Def.'s Mot. for Summ J.) Thus, Defendant's alleged legitimate, non-discriminatory reason for Plaintiff's termination is that he was fired as part of a reduction in force ("RIF"). Plaintiff's Termination Checklist form, dated July 24, 2012, states the reasons for termination as both "RIF/Layoff" and "Discharged" and indicates Plaintiff would be not be eligible for rehire.

Plaintiff submitted the "Termination Checklists" for the four other employees allegedly laid off as part of the July 2012 RIF. These checklists were produced by Defendant only by Order of Court after Plaintiff filed a successful motion to compel. As explained in more detail below, the checklists indicate that one employee voluntarily resigned on July 6, 2012, three employees were laid off on July 12, 2012, and only Plaintiff was terminated on July 24, 2012.

## III.    Summary Judgment Standard

Summary judgment is proper only if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that no genuine issue of material fact exists. *See Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006). The Court resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party. *Id.* However, the party seeking

to overcome a motion for summary judgment may not "rest on mere allegations" in its complaint but must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The party seeking to overcome a motion for summary judgment must also make a showing sufficient to establish the existence of those elements essential to that party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-33 (1986).

## IV.     ADA - Hostile Work Environment (ADD)

Hostile work environment claims brought under the ADA are analyzed using the standards applied to similar claims brought under Title VII. *Lanman v. Johnson Cty., Kan.*, 393 F.3d 1151, 1156 (10th Cir. 2004) (explaining "parallel purposes and remedial structures" of Title VII and the ADA in holding that hostile work environment claim is actionable under ADA); *Campbell v. Wal–Mart Stores, Inc.*, 272 F. Supp. 2d 1276, 1292 (N.D. Okla. 2003) (applying Title VII standards to ADA hostile work environment claim). Extrapolating from Title VII, the elements of an ADA hostile work environment claim are: (1) the plaintiff is a member of a protected group, *i.e.*, he is "disabled" within the meaning of the ADA; (2) the plaintiff was subject to unwelcome harassment; (3) the harassment was based on the alleged disability; and (4) due to the harassment's severity or pervasiveness, the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment. *See Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 (10th Cir. 2007) (elements of sexually hostile work environment claim).

To determine whether a workplace environment rises to the level of hostile, courts look at the totality of the circumstances and consider factors such as: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance. *Nat'l*

*R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002). "The run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces is not the stuff of a Title VII hostile work environment claim." *Morris v. City of Colo. Springs*, 666 F.3d 654, 664 (10th Cir. 2012).

Plaintiff has failed to present any genuine question of fact as to the third or fourth elements of his prima facie case. In his deposition, Plaintiff testified that certain supervisors and co-workers called him old, senile, and made other remarks indicating they thought Plaintiff was crazy or psychotic. Plaintiff testified that his ADD caused him to space out and led to these types of remarks being made to him in the workplace. However, there is no evidence that the alleged harassers were aware of Plaintiff's ADD, regarded Plaintiff as having ADD, or were aware of any other "disability" at the time of the alleged harassment. Plaintiff testified that he did not disclose his ADD and took steps to conceal it from his employer so that he would not be viewed in a negative light. Therefore, Plaintiff cannot demonstrate that any harassment was because of his alleged disability of having ADD or any other disability.

Plaintiff also cannot demonstrate the harassment was so severe or pervasive that it created a hostile working environment. When asked to describe all evidence in support of this claim, Plaintiff described stray remarks that Plaintiff was old or senile; one incident where a co-worker asked if Plaintiff was ready for the "padded wagon" yet; one incident where a news article with the word "crazy" was left on a desk; and one incident where Kinsch, his supervisor, called him "old" in front of three or four other people. These incidents were not frequent or severe, were primarily instigated by co-workers, and fall within the realm of boorish, juvenile behavior. Although Plaintiff was treated by Dr. Rider for high blood pressure during this time, the incidents described by Plaintiff

taken together cannot be described as so severe or pervasive that they altered a term, condition, or privilege of Plaintiff's employment.

**V.      ADA - Wrongful Termination (Neck Injury)[3]**

To present a claim of ADA wrongful termination, a plaintiff must show: (1) he is disabled within the meaning of the ADA; (2) he can perform, either with or without reasonable accommodation, the essential functions of the desired job; and (3) that his employer terminated him because of his disability. *Bartee v. Michelin N. Am., Inc.*, 374 F.3d 906, 912 n.4 (10th Cir. 2004). If the plaintiff makes such a showing, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its actions. *Carter v. Pathfinder Energy Svcs., Inc.*, 662 F.3d 1134, 1142 (10th Cir. 2011). The plaintiff then bears the ultimate burden of showing that the defendant's proffered reason is a pretext designed to mask discrimination. *Id.* Defendant argues Plaintiff cannot satisfy the first element of his prima facie case or show any evidence of pretext.[4]

---

[3]   Because Plaintiff was ultimately terminated, the Court analyzes this as a wrongful termination rather than a mere failure to accommodate/reassign.

[4]   Defendant does not challenge the second element of whether Plaintiff could perform the essential functions of the shrink wrapper position – the position he held at the time of his termination – with or without a reasonable accommodation.

## A. Disability[5]

The term "disability" means, with respect to an individual–

(A) a physical . . . impairment that substantially limits one or more major life activities of such individual;
(B) a record of such an impairment; or
(C) being regarded as having such an impairment (as described in paragraph (3)).

42 U.S.C. § 12102(1)(A)-(C). Regardless of which type of "disability" is at issue, the term must be "construed in favor of broad coverage of individuals . . . to the maximum extent permitted by the terms of this chapter." *Id.* § 12102(4)(A). In this case, Plaintiff's arguments reveal that he seeks to prove an actual disability under 42 U.S.C. § 12102(1)(A).

In order to show an actual disability under § 12102(1)(A), Plaintiff must "(1) have a recognized impairment, (2) identify one or more appropriate major life activities, and (3) show the impairment substantially limits one or more of those activities." *Felkins v. City of Lakewood*, 774

---

[5] Congress passed the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA") with the explicit purpose of broadening the protections of the Americans with Disabilities Act of 1990 ("ADA") and rejecting certain Supreme Court law interpreting the ADA's definition of disability. *See* Pub. L. No. 110–325, 122 Stat. 3553; *Smothers v. Solvay Chem., Inc.*, 740 F.3d 530, 545 n.16 (10th Cir. 2014) ("The Amendments Act created a broader definition of disability to protect more individuals, by, inter alia, expanding what is considered a major life activity and directing courts to interpret 'substantial limitation' broadly in favor of coverage."); *Carter v. Pathfinder Energy Svcs., Inc.*, 662 F.3d 1134, 1144 (10th Cir. 2011) ("Congress amended the ADA in 2008 to correct what it viewed as an overly restrictive interpretation of the statute's terms that had been adopted by the Supreme Court in [*Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999) and *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184 (2002)].") (internal quotation marks omitted); *Allen v. Southcrest Hosp.*, 455 F. App'x 827, 834 (10th Cir. 2011) (discussing the "more favorable definition of disability as clarified by the [ADAAA] and applied in the new regulations promulgated under the ADAAA"). Because all relevant events occurred after the ADAAA took effect on January 1, 2009, the amendments apply in this case. *Carter*, 662 F.3d at 1144 (explaining that ADAAA applies prospectively only). For a more comprehensive analysis of the ADAAA by this Court, *see Marsh v. Terra, Int'l*, 2015 WL 4139421 (N.D. Okla. July 9, 2015).

F.3d 647, 650 (10th Cir. 2014). The first two requirements are questions of law, while the third is a question of fact. *Sanchez v. Vilsack*, 695 F.3d 1174, 1179 (10th Cir. 2012).

### 1. Recognized Impairment

Plaintiff testified that he suffered one neck injury in 2010, which he neither reported nor had treated by a doctor. He then suffered another neck injury in February 2012, which he reported to Defendant. Defendant apparently directed him to MedCenter, where various doctors examined his fitness for work, ordered an MRI, and ultimately released him to work with restrictions. Construing Plaintiff's testimony favorably, the MRI ordered in 2012 indicated Plaintiff had a herniated disk, rather than merely a pinched nerve in his neck as Plaintiff believed.[6] The Court concludes that Plaintiff's neck injury – a herniated disk – qualifies as a recognized physical impairment affecting his musculoskeletal system. *See* 29 C.F.R. § 1630.2(h)(1) (defining physical impairment as "[a]ny physiological disorder or condition . . . affecting one or more body systems, such as . . . musculoskeletal . . . .").

### 2. Major Life Activity

Next, Plaintiff must identify the major life activity or activities impacted by this physical impairment. The regulations list the following examples of major life activities:

> Caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working[.]

---

[6] Part of Plaintiff's Exhibit 29 is an Independent Medical Examination report by a physician at Central States Orthopedic, which was conducted on June 7, 2012 in conjunction with Plaintiff's workers' compensation claim. It states Plaintiff has paracentral disk herniation right C5-C6 with stenosis greater on the right than the left at C5-C6. Although not currently presented in admissible form, this record is consistent with Plaintiff's testimony and could possibly be used at trial if properly authenticated.

*Id.* § 1630.2(i)(1)(i). The regulations implementing the ADAAA further explain that "[i]n determining other examples of major life activities, the term 'major' shall not be interpreted strictly to create a demanding standard for disability" and that "[w]hether an activity is a 'major life activity' is not determined by reference to whether it is of 'central importance to daily life.'" *Id.* § 1630.2(i)(2). By removing the "central importance to daily life," the new regulations make a drastic change in the "major life activity" component of the disability analysis.[7]

In this case, Plaintiff argues that his neck injury impacts his ability to "lift, sit, and drive without pain" and that he "has little strength in [his] hands when it comes to twisting (screwdrivers...)". (Am. Resp. ¶ 14.) Sitting and lifting are expressly listed in the regulations. Plaintiff's testimony also reveals that he has trouble performing manual tasks, such as twisting a screwdriver. Plaintiff has therefore identified major life activities, as that term is defined in the regulations.

### 3. Substantially Limits

The closer question is whether Plaintiff has created a genuine question of fact as to whether his neck injury "substantially limits" his ability to sit, lift, drive, or perform manual tasks, *see* 42 U.S.C. § 12102(1)(A), as compared to most people in the general population, *see* 29 C.F.R. § 1630.2(j)(1)(ii) (explaining that proper comparator is the "general population"). Although the "substantially limits" language remains in the statute following passage of the ADAAA, the implementing regulations now state that the impairment "need not prevent, *or significantly or severely* restrict, the individual from performing a major life activity in order to be considered

---

[7] The "central importance to daily life" standard was adopted by the Supreme Court in *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184, 198 (2002), which was superseded by the ADAAA.

substantially limiting." 29 C.F.R. § 1630.2(j)(1)(ii) (emphasis added). Further watering down the "substantially limits" statutory language, the regulations explain that this phrase: (1) is to be construed broadly in favor of expansive coverage, 29 C.F.R. § 1630.2(j)(1)(i); (2) "is not meant to be a demanding standard;" *id.;* (3) is a threshold issue that "should not demand extensive analysis," *id.* § 1630.2(j)(1)(iii); (4) requires a lower "degree of functional limitation" than under the pre-amendment version of the ADA, *id.* § 1630.2(j)(1)(iv); and (5) does not require scientific, medical, or statistical analysis, *id.* § 1630.2(j)(1)(v).

There is tension between the "substantially limits" statutory language and the interpretive regulations adopted by the EEOC following passage of the ADAAA, which reflect Congress' intent to lessen the "substantially limits" burden. Attempting to reconcile the statute and interpretive guidance, the Court concludes that "substantially" must be given some meaning, *i.e.*, not just any "limitation" on a person's abilities will suffice. However, "substantially" means something less than significantly or severely and is not meant to be a demanding standard. With these principles in mind, the Court interprets "substantially limits" as something akin to "materially restricts." *See* Cmt., Andrew E. Henry*, The ADA Amendments Act of 2008: Why the Qualified Individual Analysis is the New Battleground for Employment Discrimination Suits*, 67 Okla. L. Rev. 111, 137-38 (2014) (urging EEOC to adopt "materially restricts" language and explaining that ADAAA's legislative history supports this standard). This gives meaning to the statutory language without running afoul of Congress' intent in passing the ADAAA or the EEOC's interpretive guidance.

Applying this standard, Plaintiff has created a genuine question of fact as to whether his neck injury, *i.e.*, his herniated disk, substantially or materially limits his ability to lift or perform manual tasks, in comparison with most people in the general population. The last record of MedCenter,

dated March 13, 2012, indicates that Plaintiff should avoid lifting, carrying, pushing, or pulling over ten pounds, avoid *any* right-handed work, and avoid working with his arms overhead. Under the ADAAA's relaxed standard, which does not require medical or scientific evidence, the Court finds this to be sufficient evidence to survive summary judgment as to whether Plaintiff's neck injury materially limits his ability to perform the major life activities of lifting or performing manual tasks.

### B.    Pretext

The July 2012 RIF is Defendant's preferred legitimate, non-discriminatory reason for Plaintiff's termination on July 24, 2012. Plaintiff has presented evidence of weaknesses or implausibilities in Defendant's explanation. Peters testified that, due to the RIF, two employees were terminated in the Production Department on July 12, 2012, and that three employees (including Plaintiff) were terminated in the Production Department on July 24, 2012. However, Defendant's own internal records are inconsistent with Peters' affidavit. The "termination checklists" produced by Defendant indicate that one employee voluntarily resigned on July 6, 2012, two employees were laid off on July 12, 2012, and only Plaintiff was laid off on July 24, 2012. This contradicts Peters' testimony that two other individuals were laid off on the same day as Plaintiff. Defendant appears to rely heavily, if not solely, upon Peters' testimony as evidence of the July 2012 RIF. After being ordered by the Court to produce any financial documents reflecting the slow-down in business in July 2012 that it intended to use at trial, Defendant produced none and stated it did not anticipate using any such documents at trial. (*See* Pl.'s Ex. 36.) Therefore, this contradiction is highly relevant.

Additionally, Plaintiff testified that the machine he worked on requires two people, and that he believes "someone had to replace [him]." (Def.'s Mot. for Summ. J., Ex. B at 131:5-9.) This

pretext evidence is sufficient to survive a motion for summary judgment. However, Plaintiff still bears the burden of persuading a factfinder that he was fired because of his neck injury.

## VI.    ADA - Retaliation

A prima facie case of retaliation under the ADA requires: "(1) that [an employee] engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *EEOC v. Picture People, Inc.*, 684 F.3d 981, 988 (10th Cir. 2012). "If a plaintiff establishes these factors, the employer has the burden of showing it had a legitimate, nondiscriminatory reason for the adverse action." *Id.* "If the employer can do so, the burden shifts back to the plaintiff to prove pretext, which requires a showing that the proffered non-discriminatory reason is unworthy of belief." *Id.* (internal citation and quotation marks omitted).

### A.    Prima Facie Case

In this case, there are two possible types of opposition to ADA discrimination: (1) reporting of a hostile work environment related to ADD, and (2) reporting violation of workplace restrictions related to his neck injury.

#### 1.    Reporting of Hostile Work Environment (ADD)

Plaintiff first reported the "crazy/senile" comments, and the alleged abusive working environment stemming therefrom, to Defendant's management sometime in 2011. Assuming this constituted protected opposition to ADA discrimination, Plaintiff cannot demonstrate the second element – namely, that he suffered any materially adverse actions as a result of this reporting. Plaintiff contends that, following this complaint, he quit receiving certain awards. However,

14

Plaintiff has failed to adequately demonstrate the role these awards played in his compensation or otherwise specify how they impacted his employment. In addition, Kinsch testified that Defendant quit giving any achievement awards in May 2009. Accordingly, Plaintiff cannot make a prima facie case with respect to this type of opposition.

### 2. Reporting of Violation of Workplace Restrictions (Neck Injury)

In relation to his neck injury, Plaintiff reported possible ADA violations on two occasions: (1) on April 11, 2012, when he complained to Colburn at Defendant's insurance company that he was being forced to do work in violation of his workplace restrictions as a slitter; and (2) when he complained, at some later time, to Defendant's management that his new position as a shrink wrapper also violated his restrictions.

### a. April 11, 2012 Complaint About Slitter Position

Plaintiff has presented evidence that Defendant took adverse employment action against him the day following his complaint to Defendant's insure. Specifically, on April 12, 2012, he was transferred to the lower-paying shrink wrapper position on the day shift, which Plaintiff did not want. Although Defendant contends this was an attempt to comply with Plaintiff's workplace restrictions, Plaintiff testified that Defendant made no effort to discuss with him whether there was an accommodation on the slitter or on any other night-shift position within his restrictions. This is sufficient to create a question of fact and survive summary judgment on the question of whether Plaintiff can establish a prima facie case of retaliation.

### b. Subsequent Complaint About Shrink Wrapper Position

The relevant adverse employment action related to this complaint is Plaintiff's termination on July 24, 2012. Plaintiff asserts that he complained about having to push heavy pallets of paper

in his position as a shrink wrapper, in violation of his workplace restrictions. He asserts that his last "complaint" about this occurred during his workers' compensation deposition on July 5, 2012. With approximately two weeks between the last alleged reporting of ADA non-compliance and Plaintiff's termination, there is sufficient temporal proximity to survive summary judgment as to the third element.

### B. Pretext

For the same reasons explained above, the Court concludes that Plaintiff has presented sufficient evidence to cast doubt on Defendant's asserted reasons for the April 12, 2012 transfer and the July 24, 2012 termination, such that Plaintiff is entitled to reach a factfinder on the question of ADA retaliation.

### VII. Oklahoma Workers' Compensation Retaliation

Plaintiff filed a claim under the Oklahoma Workers' Compensation Act on April 17, 2012, approximately three months prior to his termination. Plaintiff alleges he was discharged in retaliation for filing such claim.

Under Oklahoma law, a plaintiff's prima facie burden in a retaliatory discharge case is "relatively easy." *Buckner v. Gen. Motors Corp.*, 760 P.2d 803, 806 (Okla. 1988). "The discharged employee must show employment, on the job injury, receipt of treatment under circumstances which put the employer on notice that treatment had been rendered for a work-related injury, or that the employee in good faith instituted, or caused to be instituted, proceedings under the [Workers' Compensation] Act, and consequent termination of employment." *Id.* "After a prima facie case is established, the burden then appropriately shifts to the employer to rebut the inference that its motives were retaliatory by articulating that the discharge was for a legitimate non-retaliatory reason

for the discharge." *Id.* at 807. "The employer need not persuade the court that it was actually motivated by the proffered reasons," just that its "evidence raises a genuine issue of fact concerning whether it retaliatorily discharged the employee." *Id.* The employee then "bears the burden of persuasion that the reason given for termination was pretextual," which "merges with the ultimate burden of persuading the court that she has been the victim of retaliatory discharge." *Id.* The employee may accomplish this directly by persuading the court that the discharge was significantly motivated by retaliation for her exercise of statutory rights, or indirectly by showing that the employer's proffered explanation is unworthy of credence. *See id.*

In this case, Plaintiff has demonstrated employment with Defendant; a workplace injury in February 2012; receipt of treatment by MedCenter which put Defendant on notice of a work-related injury; filing of a claim under the Workers' Compensation Act; and termination of his employment. Defendant has met its burden of production as to the reason for termination through Peters' affidavit – namely, the July 2012 RIF. For the same reasons explained above, Plaintiff has shown contradictions and weaknesses in this explanation, such that a factfinder must determine if Plaintiff can meet his ultimate burden of persuasion as to whether he suffered a retaliatory termination.

## VIII. Title VII - Sexually Hostile Work Environment

The elements of a sexually hostile work environment claim are: (1) the plaintiff is a member of a protected group; (2) the plaintiff was subject to unwelcome harassment; (3) the harassment was based on sex; and (4) due to the harassment's severity or pervasiveness, the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment. *See Harsco Corp.,* 475 F.3d at 1186. Defendant argues that Plaintiff's allegations cannot satisfy the third or fourth elements. The Court assumes without deciding that the harassment

was based on his sex as a male but concludes that summary judgment is proper based on Plaintiff's inability to satisfy the fourth element.

To survive summary judgment on a claim alleging a sexually hostile work environment, a plaintiff must prove that "a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment and that the victim was targeted for harassment because of ... [her sex]." *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 957 (10th Cir.2012) (internal quotation marks omitted) (quoting *Morris v. City of Colo. Springs*, 666 F.3d 654, 663–64 (10th Cir.2012)). The conduct in question must be judged by both an objective and a subjective standard; this "dual standard asks both whether the plaintiff was offended by the work environment and whether a reasonable person would likewise be offended." *Id.*

To determine whether a workplace environment rises to the level of hostile, courts look at the totality of the circumstances and consider factors such as: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is "physically threatening or humiliating, or a mere offensive utterance;" and (4) whether it unreasonably interferes with an employee's work performance." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002). "The run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces is not the stuff of a Title VII hostile work environment claim." *Morris*, 666 F.3d at 664.

The Court has carefully reviewed Plaintiff's deposition testimony regarding the alleged sexual harassment and finds that the alleged sexual harassment was not severe or pervasive and did not alter the terms or conditions of Plaintiff's employment. The primary incidents about which

Plaintiff complains involved co-workers making inappropriate remarks or gestures, such as (1) when a co-worker told him he looked gay while someone did something behind Plaintiff's back; (2) when a co-worker skipped like a girl behind him while Plaintiff was talking to Kinsch; (3) when two male co-workers simulated humping in his presence; and (4) when wrestler dolls were placed in a sexual position in a place where Plaintiff would view them. The most serious incident occurred when a co-worker touched Plaintiff's rear and talked about viewing pornography with him.

At some point in time, Plaintiff complained to Peters about this sexual harassment, and Plaintiff admits that most of the harassment stopped following this complaint. After Plaintiff's meeting with Peters, the only sexually charged incidents occurred when co-workers pretended to play with themselves in Plaintiff's presence. They did not say anything to Plaintiff while doing it or look at Plaintiff while they did it. Plaintiff did not testify how often this occurred.

Viewed in its most favorable light, the harassment was not so severe or pervasive that it altered the terms and conditions of Plaintiff's employment, either subjectively or objectively. Plaintiff did not present specific evidence as to the frequency of the comments. But Plaintiff testified that the behavior was, in most instances, not specifically directed at him and did not interfere with his ability to do his job. Further, the harassment largely stopped after Plaintiff reported it to Peters. As to the one event involving an advance by a co-worker, Plaintiff did not view this as a sexual advance, did not report this activity as harassment, and did not provide Defendant an opportunity to end the harassment. While Plaintiff undoubtedly endured uncomfortable and embarrassing moments in his workplace, the incidents described are more like boorish, juvenile behavior than sexually harassing conduct aimed directly at Plaintiff.

## IX.    Title VII - Retaliation

Title VII makes it unlawful for an employer to retaliate against an employee for participating in certain protected activity, including opposing discrimination. 42 U.S.C. § 2000e-3(a). To make out a prima facie case of Title VII retaliation, Plaintiff must show (1) he engaged in protected opposition to discrimination, (2) a reasonable employee would have found the challenged action materially adverse, and (3) a causal connection existed between the protected activity and the materially adverse action. *Conroy v. Vilsack*, 707 F.3d 1163, 1181 (10th Cir. 2013).

Assuming Plaintiff engaged in protected opposition to discrimination – either by complaining to Peters or describing sexual harassment during his July 5, 2012 workers' compensation deposition – Plaintiff's deposition testimony in this case reveals the lack of any causal connection between the reporting and any adverse employment action. Plaintiff admitted that he did not believe he was reassigned to the day shift or terminated based on his complaints regarding the sexual harassment. When asked these questions in his deposition, he admitted that he "did not think so." Although Plaintiff recounted an incident in which Kinsch told him he would have to live with people spreading rumors, this statement does not indicate any causal link between the reporting of sexual harassment and the relevant adverse actions. Thus, Plaintiff has not presented sufficient evidence of the third element of his prima facie case.

## X.    Conclusion

Defendant's Motion to Strike (Doc. 70) is GRANTED. Referral of Plaintiff's Motion to Deem Admissions is hereby withdrawn, and the motion (Doc. 61) is DENIED.

Defendant's Motion for Summary Judgment (Doc. 47) is GRANTED in part and DENIED in part as follows:

I.  ADA - Hostile Work Environment (ADD) - GRANTED.
II.  ADA - Wrongful Termination (Neck Injury) - DENIED.
III.  ADA - Retaliation
        Reporting Hostile Work Environment (ADD) - GRANTED.
        Reporting Workplace Violations (Neck Injury) - DENIED.
IV.  Workers' Compensation Retaliation - DENIED.
V.  Title VII - Sexually Hostile Work Environment - GRANTED.
VI.  Title VII - Retaliation - GRANTED.

As agreed by the parties, this matter is set for a non-jury trial. The only remaining issues for trial are (1) whether Defendant discriminated against Plaintiff based upon his disability of a neck injury (herniated disk) when it terminated Plaintiff; (2) whether Defendant retaliated against Plaintiff for reporting non-compliance with certain workplace restrictions by either (a) transferring him to a different position on the night shift in April 2012 and/or (b) terminating him in July 2012; and (3) whether Defendant retaliated against Plaintiff for filing a workers' compensation claim on April 17, 2012.

The Court advises Plaintiff, who will be appearing pro se at a bench trial before the Court, that the only disability at issue is his neck injury, not the alleged disability of ADD. There are no remaining hostile work environment claims, and there will likely be no reason to present evidence regarding the "old/senile" comments or sexual comments allegedly made to Plaintiff in the workplace.

**SO ORDERED** this 2nd day of September, 2015.

Terence C Kern

**TERENCE C. KERN**
**UNITED STATES DISTRICT JUDGE**